IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND F. WILLIAMS,<br>LARRY A. TOTH,<br>U.S. TECHNOLOGY CORPORATION, and<br>U.S. TECHNOLOGY AEROSPACE<br>  ENGINEERING CORPORATION | CRIMINAL NO. 5:17-CR-29-LJA<br><br>VIOLATION: 18 U.S.C. § 371<br>18 U.S.C. § 201(b)(1)(A)<br>18 U.S.C. § 1956(h)<br>18 U.S.C. § 2<br>18 U.S.C. § 981(a)(1)(C)<br>18 U.S.C. § 982(a)(1)<br>28 U.S.C. § 2461(c) |

THE GRAND JURY CHARGES:

COUNT ONE

THE CONSPIRACY TO BRIBE A PUBLIC OFFICIAL

A. INTRODUCTION

At all times relevant to this indictment:

1. Defendant RAYMOND F. WILLIAMS ("WILLIAMS") was the President, owner, and chief executive officer of U.S. TECHNOLOGY CORPORATION ("UST"). UST is a registered corporation in the State of Ohio, with headquarters in Canton, Ohio. UST is the parent company of U.S. TECHNOLOGY AEROSPACE ENGINEERING CORPORATION ("USTAE"). USTAE is also a registered corporation in the State of Ohio, with headquarters in Canton, Ohio. WILLIAMS was the President of USTAE.

2. UST provided dry Plastic Media Blasting ("PMB") pellets for stripping paint from aircraft bodies during maintenance and re-painting. USTAE provided metal fabrication services. UST and USTAE provided products and services to the United States Government at Robins Air Force Base ("RAFB") in Warner Robins, Georgia, through contracts awarded in or about the years 2004 through 2013. USTAE had a place of business located in Byron, Georgia.

3. Defendant LARRY A. TOTH ("TOTH") was the owner of LT Associates, Incorporated, in Canton, Ohio. He was in the business of merchandise liquidation.

4. Mark E. Cundiff ("Cundiff") was employed by the Department of Defense, a department of the United States, and was stationed at Robins Air Force Base ("RAFB"), in Warner Robins, Georgia. Cundiff was responsible for technical engineering support to military aircraft maintenance operations. It was part of his official duties to prepare statements of work when RAFB was soliciting bidders for new contracts. Cundiff retired from the United States Department of Defense in January 2014 and thereafter did not work at RAFB.

5. WILLIAMS and Cundiff had a professional and personal relationship.

6. John Christopher Reynolds ("Reynolds") was the owner of Reynolds Engineering, Inc., Macon, Georgia ("REC").

B. THE CONSPIRACY AND ITS OBJECT

Beginning on or about August 2004, and continuing through on or about January 3, 2014, the exact dates being unknown to the Grand Jury, in the Macon Division of the Middle District of Georgia and elsewhere within the jurisdiction of this Court, the defendants,

RAYMOND F. WILLIAMS,
LARRY A. TOTH,
U.S. TECHNOLOGY CORPORATION, and
U.S. TECHNOLOGY AEROSPACE ENGINEERING CORPORATION,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit an offense against the United States, that is, to knowingly, directly, indirectly, and corruptly give something of value to a public official with intent to influence an official act, in violation of Title 18, United States Code, Sections 201(b)(1), and 2.

### C. MANNER AND MEANS OF THE CONSPIRACY

The manner and means whereby the conspiracy was sought to be accomplished were as follows:

1. In 2004 or 2005, WILLIAMS requested that Cundiff provide assistance with winning PMB contracts at RAFB. At that time, RAFB began a new procurement process to establish a supplier for PMB. The new acquisition process involved the preparation of a Performance Work Statement ("PWS"). The PWS was a document that described the requirements for a bidding company to meet the United States Air Force's ("USAF") needs on a particular job. Cundiff was responsible for preparing the PWS. Cundiff prepared each PWS so that contract requirements could only be met by UST products, which gave UST a substantial advantage in winning the PMB contract. Specifically, Cundiff required using patented UST products "Quickstrip" and "Magic" in the statement of work, required a facility close to RAFB, and included a PMB recycling requirement.

2. In return for assisting WILLIAMS in obtaining the PMB contracts, WILLIAMS initially paid Cundiff $0.02 per pound for PMB purchased as a result of the contracts. The payments were made in cash, totaling approximately $2,000 to $4,000 per year.

3. In approximately 2005 or 2006, WILLIAMS and Cundiff agreed on payments of $20,000 per year in return for Cundiff's services. Cundiff's services continued to be preparing the PWSs so that UST would have a substantial advantage in obtaining PMB contracts. Cundiff received cash payments from WILLIAMS during WILLIAMS' trips to Macon, Georgia.

4. WILLIAMS counseled Cundiff not to change his lifestyle, so that people would not become suspicious of their relationship.

5. In about 2008, Cundiff, as part of his official duties at RAFB, approached the North Atlantic Treaty Organization ("NATO") Maintenance Supply Agency ("NSPA") concerning the use of their contracting vehicle to procure a long-term $25,000,000 PMB supply contract for RAFB. The NSPA contract would allow any customer from a NATO country to purchase from the contract. Cundiff prepared the contract requirements to ensure that UST was awarded the contract.

6. On or about August 25, 2009, WILLIAMS and UST became subject to a forebearance agreement with Key Bank National Association, a national banking association located in Cleveland, Ohio. This agreement required that an independent consulting company scrutinize the expenditure of UST's funds, and limited WILLIAMS' ability to make cash withdrawals from UST bank accounts without oversight. The forebearance agreement and resulting additional scrutiny on the expenditure of UST funds caused WILLIAMS to develop new means to make payments to Cundiff, using intermediary individuals and companies known and unknown to the Grand Jury.

7. Beginning in September of 2009, WILLIAMS caused Cundiff to be paid by checks through defendant TOTH and his business. WILLIAMS would pay TOTH, and TOTH thereafter paid Cundiff $3,000 per month for consulting services that were not performed. These payments were made to appear that they were for legitimate services provided by Cundiff to TOTH'S

business when in fact, they were not. TOTH and his company served as the intermediary for payments from WILLIAMS to Cundiff for approximately twenty months from 2009 to 2011, totaling $55,500. After this arrangement ceased, cash payments from WILLIAMS to Cundiff resumed.

8. In August and September of 2011, WILLIAMS provided payments to Cundiff using Reynolds and through a business owned by WR. WILLIAMS provided fraudulent invoices from REC to WR's business, and provided the funds and instructions for WR's business to pay Reynolds in relation to the fraudulent invoices. Reynolds would thereafter use this source of funds to make additional payments to Cundiff. WILLIAMS instructed WR to keep a portion of the payments as a fee for assisting with the payments to Reynolds.

9. In about 2009, Cundiff was assigned as the RAFB Technical Point of Contact "POC" on a C-17 aircraft work stand contract. Work stands are used on the C-5/C-17/C-130 aircraft during maintenance due to the size of the aircraft. The work stands are placed around the exterior of the aircraft and allow workers to access the wings and body of the aircraft while also providing fall protection for the workers. As the Technical POC, Cundiff reviewed, approved, and oversaw the contract requirements and the Statement of Work describing the work to be performed. In or about 2011, Cundiff took the C-17 Wing Stand procurement contract to the Army Prototype Integration Fund ("PIF"), located in Huntsville, AL. The PIF is designed to meet the needs of the US Army and Department of Defense by providing a quick response to warfighter needs through a streamlined contract vehicle. The PIF contract vehicle is a maximum of ten year or $1.45 Billion contract with Joint Venture Yulista Management Services Incorporated and Science and Engineering Services Incorporated ("JYVS"). JYVS is the prime contractor on the PIF contract for the rapid execution of PIF approved and directed projects ranging from simple to complex

platform design, fabrication, manufacturing, integration, and logistics support. Cundiff was able to influence the process by stressing RAFB's desire to use contractors local to RAFB, as opposed to contractors local to the PIF in Alabama. Cundiff informed the PIF and JYVS that he had knowledge of local contractors who could perform the various types of work and thus he recommended USTAE and another company whose identity is known to the Grand Jury ("JE"), as well as, wrote the requirements specific to those contractors. JE was previously involved in the engineering design of the C-17 wing stands. JE owned the original design drawings and was subcontracted to be paid for use of the design as well as any engineering support. USTAE would be used to fabricate and build the C-17 wing stands based on JE's design. On or about and between September 9, 2011, and June 6, 2012, the PIF awarded C-17 Wing Stand Contracts to YULISTA on behalf of the USAF to build seven sets of C-17 Aircraft work stands totaling approximately $19,500,000. JVYS utilized JE and USTAE as subcontractors for the contracts.

10.     Cundiff and WILLIAMS agreed on a plan for Cundiff to be paid for steering the C-17 Wing Stand fabrication subcontracts to USTAE. The plan involved making payments to Cundiff through Reynolds. USTAE sub-contracted through Reynolds and REC, Macon, GA for design services. While there may have been small items REC needed to perform, there largely would be no work involved in the sub-contracts. Cundiff, WILLIAMS, and Reynolds agreed to a plan whereby $40,000 monthly payments would be made to REC by WILLIAMS and UST over the life of the contracts, totaling approximately $1,080,000.00. The payments were made to REC by WILLIAMS and UST by checks that were mailed and by interstate wire transfers. The funding for these bribes paid by WILLIAMS to Cundiff was built into the contracts and shown falsely on the cost estimates provided to the PIF by Cundiff as subcontractor fees. Reynolds provided fraudulent invoices to employees at UST and USTAE to provide the purported purpose for the

payments to REC. From the payments received from WILLIAMS, UST, and USTAE, Cundiff received approximately $8,000 per month in cash from Reynolds from October 2011 until November 2013, and was also permitted to live in a house owned by Reynolds located at 105 Colaparchee Plantation Drive, Macon, GA. Cundiff paid no rent to Reynolds for use of the house. Instead, Reynolds deducted the mortgage payment for 105 Colaparchee Plantation Drive out of the monthly $40,000 payments from UST before giving cash payments to Cundiff. After payments from Reynolds stopped, WILLIAMS resumed paying Cundiff approximately $8,000 to $10,000 monthly in cash from November 2013 until January 2014.

11. WILLIAMS and Cundiff took family vacations together and stayed at each other's homes when visiting. They vacationed together in places such as Kitzbuhel, Austria; Salzburg, Austria; Arosa, Switzerland; Park City, Utah; Telluride, Colorado; Keystone, Colorado; Lake Tahoe, California; New York, New York; and Las Vegas, Nevada. Cundiff paid for these vacations with the money paid to him by WILLIAMS.

12. WILLIAMS, TOTH, Cundiff, Reynolds, and others whose identities are known to the Grand Jury conducted the conspiracy through personal meetings, e-mail, and telephone conversations. Funds were paid during the course of the conspiracy by cash, checks, and interstate wire transfers, and were often routed through intermediaries pursuant to fictitious invoices and transactions for the purpose of hiding relationships and the true sources and purposes for payments. The intermediaries were compensated for their participation, usually by being permitted to keep some of the funds provided by WILLIAMS and then forwarding payments to Cundiff.

13. Payments made by WILLIAMS during the conspiracy totaled at least $870,000.

## D. OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

1. On or about February 6, 2009, CUNDIFF sent an email from his Department of Defense email account to NSPA which approved a PMB contract proposal and pricing submitted by UST on behalf of the USAF, and in which CUNDIFF authorized NSPA to proceed with the contract award to UST.

2. On or about September 28, 2009, WILLIAMS caused TOTH to send check number 37393 to Cundiff by mail in the amount of $3,000.00 for "consulting fees."

3. On or about December 12, 2009, WILLIAMS caused TOTH to send check number 37713 to Cundiff by mail in the amount of $3,000.00 for "consulting fees."

4. On or about January 2010, WILLIAMS paid for a joint vacation to Lake Tahoe, CA for his family and the CUNDIFF family.

5. On or about January 5, 2010, WILLIAMS caused TOTH to send check number 37839 to Cundiff by mail in the amount of $3,000.00 for "consulting fees."

6. On or about June 21, 2010, WILLIAMS caused TOTH to send check number 38445 to Cundiff by mail in the amount of $3,000.00 for "consulting fees."

7. On or about December 15, 2010, WILLIAMS caused TOTH to send check number 39062 to Cundiff by mail in the amount of $3,000.00 for "consulting fees."

8. On or about March 21, 2011, WILLIAMS caused TOTH to send check number 39345 to Cundiff by mail in the amount of $3,000.00 for "consulting fees."

9. On August 18, 2011, WILLIAMS emailed WR a fictitious invoice dated August 17, 2011 from REYNOLDS ENGINEERING CORPORATION ("REC") to WR's company for

installation of fast mask kits in the amount of $15,000, and with instructions from WILLIAMS for WR to prepare and leave a check in this amount for Reynolds at the UST office in Byron, GA.

10. On August 26, 2011, WILLIAMS caused an interstate wire transfer in the amount of $50,000.00 to be sent by USTAE through UST, from UST's bank account at Key Bank to WR at WR's bank account at Citizen's Bank and Trust.

11. On September 27, 2011, WILLIAMS caused an interstate wire transfer in the amount of $20,000.00 to be sent by USTAE through UST, from UST's bank account at Key Bank to WR at WR's bank account at Citizen's Bank and Trust.

12. On or about October 14, 2011, Reynolds submitted a fictitious invoice for payment to USTAE by email.

13. On or about October 24, 2011, WILLIAMS caused UST check number 59444 in the amount of $10,000.00 to be mailed to Reynolds.

14. On or about February 10, 2012, an employee of UST sent an email to another employee of UST, which stated: "Ray wants to know what was paid out of the items listed below. He is most interested in the $30,000 you have listed for Reynolds. . . . Reason for this is that he has received two phone calls from Chris Reynolds and one call from Mark Cundiff about the payment."

15. On or about June 3, 2013, Reynolds submitted fictitious invoice number 13-0011 to USTAE in the amount of $40,000 for payment. In relation to that invoice, Reynolds sent an email to a UST employee, which stated: "Attached is the June 2013 invoice. According to my records, neither April or May's invoice has been paid."

16.  On June 19, 2012, WILLIAMS caused an interstate wire transfer in the amount of $20,000 to be sent by UST from its bank account at Key Bank, to Reynolds' bank account at Robins Federal Credit Union.

17.  On or about July 2, 2013, Reynolds submitted fictitious invoice number 13-0012 to USTAE in the amount of $40,000 for payment.

18.  On or about August 1, 2013, Reynolds submitted a fictitious invoice for payment to USTAE by email.

19.  On August 9, 2013, WILLIAMS sent an email to a UST employee, stating: "Go ahead and send the 20. Bob, please let Reynolds know where we are at against the PO. He needs to change last invoice to 20 instead of 40. After this payment we will have paid 780 and will still owe 60 or 3 more payments of 20 each."

20.  On August 9, 2013, WILLIAMS caused a wire transfer in the amount of $20,000 to be sent by UST to Reynolds in relation to invoice number 13-0011 dated June 3, 2013. Thereafter, Reynolds made nine separate cash payment to CUNDIFF totaling $18,000.

21.  On September 18, 2013, WILLIAMS sent an email to a UST employee stating "We need to make a payment to Reynolds ASAP."

22.  On September 18, 2013, WILLIAMS caused a wire transfer in the amount of $20,000 to be sent by UST to Reynolds, which was a payment in relation to invoice number 13-0012 which had been submitted by Reynolds on July 2, 2013.

23.  The monetary transactions set forth at Counts Two through Eighty-Four of this Indictment are incorporated by reference herein and are alleged as individual overt acts committed in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Sections 371 and 2.

## COUNTS TWO THROUGH EIGHTY- FOUR
[18 U.S.C. § 201(b)(1)(A) – "Bribery of a Public Official"]

On or about the dates alleged below, in the Macon Division of the Middle District of Georgia and elsewhere, the defendant,

### RAYMOND F. WILLIAMS,

directly and indirectly, knowingly, and corruptly gave something of value to a public official with intent to influence an official act, that is, defendant made and caused to be made monetary cash payments to Mark E. Cundiff, a person employed by the Department of Defense, a department of the United States, and who was stationed at Robins Air Force Base ("RAFB"), in Warner Robins, Georgia, for the purpose of securing the assistance of Cundiff in obtaining government contracts for defendant and his businesses at RAFB, each of the below described payments being identified by date and amount, and each payment being a separate count of this indictment:

| Count | Date | Amount |
| --- | --- | --- |
| 2 | 11-01-13 | $1,500.00 |
| 3 | 10-25-13 | $2,000.00 |
| 4 | 10-18-13 | $2,000.00 |
| 5 | 10-12-13 | $2,000.00 |
| 6 | 10-05-13 | $2,000.00 |
| 7 | 10-02-13 | $1,700.00 |
| 8 | 09-26-13 | $2,000.00 |
| 9 | 09-23-13 | $2,000.00 |
| 10 | 09-19-13 | $2,000.00 |
| 11 | 09-12-13 | $2,000.00 |
| 12 | 09-10-13 | $2,000.00 |
| 13 | 09-06-13 | $2,000.00 |
| 14 | 08-30-13 | $2,000.00 |
| 15 | 08-28-13 | $2,000.00 |
| 16 | 08-24-13 | $2,000.00 |
| 17 | 08-21-13 | $2,000.00 |

| | | |
|---|---|---|
| 18 | 08-15-13 | $2,000.00 |
| 19 | 08-13-13 | $2,000.00 |
| 20 | 08-05-13 | $2,500.00 |
| 21 | 08-01-13 | $2,000.00 |
| 22 | 07-29-13 | $2,000.00 |
| 23 | 07-24-13 | $2,000.00 |
| 24 | 07-22-13 | $2,000.00 |
| 25 | 07-19-13 | $2,000.00 |
| 26 | 07-15-13 | $2,000.00 |
| 27 | 07-12-13 | $2,000.00 |
| 28 | 07-03-13 | $2,500.00 |
| 29 | 07-02-13 | $3,000.00 |
| 30 | 06-28-13 | $2,000.00 |
| 31 | 06-25-13 | $2,000.00 |
| 32 | 06-21-13 | $2,000.00 |
| 33 | 06-18-13 | $2,000.00 |
| 34 | 06-13-13 | $2,000.00 |
| 35 | 06-10-13 | $2,000.00 |
| 36 | 06-06-13 | $2,000.00 |
| 37 | 05-31-13 | $2,500.00 |
| 38 | 05-29-13 | $2,200.00 |
| 39 | 05-24-13 | $1,900.00 |
| 40 | 05-17-13 | $1,700.00 |
| 41 | 05-14-13 | $2,000.00 |
| 42 | 05-10-13 | $2,000.00 |
| 43 | 05-06-13 | $2,000.00 |
| 44 | 05-02-13 | $2,000.00 |
| 45 | 04-19-13 | $2,500.00 |
| 46 | 04-10-13 | $3,000.00 |
| 47 | 04-03-13 | $2,500.00 |
| 48 | 03-20-13 | $2,800.00 |
| 49 | 03-15-13 | $2,000.00 |
| 50 | 03-04-13 | $2,000.00 |
| 51 | 02-20-13 | $2,000.00 |
| 52 | 02-15-13 | $2,000.00 |
| 53 | 02-11-13 | $2,000.00 |
| 54 | 01-29-13 | $2,000.00 |
| 55 | 01-15-13 | $2,800.00 |
| 56 | 01-04-13 | $2,100.00 |
| 57 | 12-21-12 | $3,000.00 |

| | | |
|---|---|---|
| 58 | 12-07-12 | $2,200.00 |
| 59 | 12-05-12 | $2,600.00 |
| 60 | 11-21-12 | $2,800.00 |
| 61 | 11-15-12 | $2,000.00 |
| 62 | 11-13-12 | $2,000.00 |
| 63 | 11-08-12 | $2,000.00 |
| 64 | 11-05-12 | $2,400.00 |
| 65 | 10-25-12 | $2,000.00 |
| 66 | 10-23-12 | $1,900.00 |
| 67 | 10-19-12 | $2,000.00 |
| 68 | 10-10-12 | $2,000.00 |
| 69 | 10-03-12 | $2,000.00 |
| 70 | 10-02-12 | $2,000.00 |
| 71 | 09-21-12 | $2,000.00 |
| 72 | 09-13-12 | $2,000.00 |
| 73 | 09-06-12 | $2,000.00 |
| 74 | 08-30-12 | $2,000.00 |
| 75 | 08-29-12 | $2,000.00 |
| 76 | 08-23-12 | $2,000.00 |
| 77 | 08-15-12 | $2,000.00 |
| 78 | 08-03-12 | $2,200.00 |
| 79 | 07-18-12 | $2,400.00 |
| 80 | 07-13-12 | $2,000.00 |
| 81 | 07-10-12 | $2,200.00 |
| 82 | 06-25-12 | $2,000.00 |
| 83 | 06-22-12 | $2,100.00 |
| 84 | 06-19-12 | $2,100.00 |

All in violation of Title 18, United States Code, Sections 201(b)(1)(A) and 2.

## COUNT EIGHTY-FIVE

### A. THE CONSPIRACY TO LAUNDER THE PROCEEDS OF UNLAWFUL ACTIVITY

On or about September 28, 2009, the exact date being unknown to the Grand Jury, and continuing to on or about November 5, 2013, in the Macon Division of the Middle District of Georgia and elsewhere, the defendants,

> RAYMOND F. WILLIAMS,
> LARRY A. TOTH,
> U.S. TECHNOLOGY CORPORATION, and
> U.S. TECHNOLOGY AEROSPACE ENGINEERING CORPORATION,

and others both known and unknown to the Grand Jury, knowingly conspired and agreed together and with each other, and with others both known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Section 1956, that is:

to conduct and attempt to conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, that is, bribery of a public official, knowing that the transaction is designed in whole or in part to conceal and disguise the nature and source of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## B. OBJECTS OF THE MONEY LAUNDERING CONSPIRACY

1.  It was the object of the money laundering conspiracy that after the defendants and other conspirators offered, promised, and agreed that bribes would be paid to a public official to influence official acts, the defendants would cause bribes to be payed indirectly to a public official

through one or more intermediaries to hide the illegal payments and to create the appearance that the payments were for legitimate services and were from legitimate sources.

2. It was further the object of the money laundering conspiracy to conceal the bribery scheme, prevent its detection, and facilitate its continuation.

C. MANNER AND MEANS OF THE MONEY LAUNDERING CONSPIRACY

1. Parts A and C of Count One of this Indictment are incorporated by reference herein for the purpose of describing the manner and means of the money laundering conspiracy.

All in violation of Title 18, United State Code, Section 1956(h).

**FORFEITURE NOTICE**
**(18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and**
**28 U.S.C. § 2461(c) - Criminal Forfeiture)**

1. The allegations contained in Counts One through Eighty-Five of this Indictment are hereby re-alleged and incorporated by reference into this Notice for the purpose of alleging forfeitures to the United States of America, pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c), and/or Title 18, United States Code, Section 982(a)(1).

2. Upon conviction of the offense(s) in violation of Title 18, United States Code, Section 371 set forth in Count One, Title 18, United States Code, Section 201(b)(1)(A) set forth in Counts Two through Eighty-Four, and/or Title 18, United States Code, Section 1956(h) set forth in Count Eighty-Five of this Indictment, the defendant(s),

RAYMOND F. WILLIAMS,
LARRY A. TOTH,

U.S. TECHNOLOGY CORPORATION, and
U.S. TECHNOLOGY AEROSPACE ENGINEERING CORPORATION,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), in conjunction with and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s), and/or any property, real or personal, involved in such offense(s), or any property traceable to such property, including, but not limited to: $20,000.00 in United States funds, and/or a personal money judgment in an amount to be determined.

      3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a)    cannot be located upon exercise of due diligence;

    (b)    has been transferred, sold to or deposited with, a third person;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be subdivided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 981(a)(1)(C), through Title 28, United States Code, Section 2461(c), and Title 18 United States Code, Section 982(b)(1).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982, and 28 U.S.C. § 2461(c).

A TRUE BILL.

_____
s/FOREPERSON OF THE GRAND JURY

Presented by:

G.F. PETERMAN, III
UNITED STATES ATTORNEY

*[signature]*
PAUL C. MCCOMMON III
ASSISTANT UNITED STATES ATTORNEY

Filed in open court this 14 day of June, 2017.

*[signature]*
Deputy Clerk