3 14 , 20 18

F. Rushing

Courtroom Deputy
U.S. District Court
Middle District of Georgia

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

UNITED STATES OF AMERICA      :
     :    CRIMINAL NO. 5:17-CR-29-LJA
VS.      :
     :
RAYMOND F. WILLIAMS      :
     :

## PLEA AGREEMENT

It is agreed by the United States of America, by and through its undersigned attorney, and

RAYMOND F. WILLIAMS, hereinafter referred to as "Defendant," and defendant's undersigned

attorney, as follows:

(1)

Defendant acknowledges that he has reviewed and discussed the indictment against him in

this matter with his attorney and his attorney has explained to defendant his understanding of the

government's evidence.

(2)

The defendant understands that he is not required to plead guilty, and that he has the right

to plead not guilty and to elect instead to be tried by jury.   The defendant understands that at a

jury trial, he would enjoy a presumption of innocence, and that the government would have the

burden of proving defendant's guilt beyond a reasonable doubt.   The defendant understands that

he would be entitled to the services of a lawyer at all stages of such a trial.   The defendant

understands that he would be entitled to confront and to cross-examine the government's proof, and to present witnesses and evidence in defendant's own behalf.   The defendant understands that he would have the right to testify in his own behalf, but that he could not be compelled to do so. Defendant has discussed these rights with his attorney.   Defendant is satisfied with the services of his lawyer.   Defendant knowingly and voluntarily waives his right to plead not guilty and to proceed to trial.

The United States Attorney and the Defendant understand and agree that the Court should consider its sentence in light of the advisory Federal Sentencing Guidelines, as explained in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 ( 2005).     Defendant knowingly and voluntarily waives any further objections that Defendant may have based on Booker, Apprendi v. New Jersey, 530 U.S. 466 (2000), and their progeny.   The Defendant agrees that at sentencing the Court may determine any pertinent fact by a preponderance of the evidence and the Court may consider any reliable information, including hearsay.   The Defendant expressly waives any claim of right to an indictment, trial by jury, and/or proof beyond a reasonable doubt on any factual determinations that pertain to sentencing in this case.

(3)

Defendant being fully cognizant of his rights, and in exchange for the considerations to be made by the United States as set forth in paragraph (4) below, agrees pursuant to Rule 11(c), Federal Rules of Criminal Procedure, as follows:

(A)     The defendant is guilty and will knowingly and voluntarily enter a plea of guilty to Count One of the indictment which charges defendant with "Conspiracy to Bribe a Public

2

Official," in violation of Title 18, United States Code, Sections 371 and 2.

(B)     That defendant fully understands that his plea of guilty as set forth in Subparagraph (A), above, will subject him to a maximum sentence on Count One of five (5) years imprisonment, a maximum fine of $250,000, a term of supervised release of three (3) years, and a mandatory assessment of $100.00.

(C)     The defendant acknowledges and understands that the Court is not bound by any estimate of the advisory sentencing range that defendant may have received from his counsel, the government, or the Probation Office.     The defendant further acknowledges and agrees that defendant will not be allowed to withdraw his plea because he has received an estimated guideline range from the government, defendant's counsel, or the Probation Office which is different from the advisory guideline range computed by the Probation Office in the Presentence Report and found by the Court to be the correct advisory guideline range.

(D)     The defendant understands fully and has discussed with his attorney that the Court will not be able to determine an advisory guideline sentence until after a presentence investigative report has been completed.     The defendant understands and has discussed with defendant's attorney that he will have the opportunity to review the presentence investigative report and challenge any facts reported therein.     The defendant understands and has discussed with defendant's attorney that any objections or challenges by the defendant or defendant's attorney to the Presentence Report, the Court's evaluation and rulings on that Report, or the Court's sentence, will not be grounds for withdrawal of the plea of guilty.

(E)     Defendant understands and has discussed with defendant's attorney that after the

3

Court considers the advisory guideline range for this case, the Court will have the discretion to impose a sentence that is more severe or less severe than the advisory guideline range.

(F)     Defendant agrees to provide a check for the mandatory assessment at the time of sentencing.

(G)     Defendant understands, and has fully discussed with defendant's attorney, that concerning Count One the Court shall order total restitution in this case pursuant to 18 U.S.C. § 3663A and that defendant agrees to pay the restitution ordered by the Court whether to an identifiable victim or the community.   Defendant agrees to pay restitution to the United States Department of Defense in the amount of $850,000.00.   Defendant agrees that the total amount of restitution reflected in this Plea Agreement results from defendant's fraudulent conduct as described in the indictment to which he is entering a plea of guilty.

(H)     Defendant agrees to pay a fine in the amount of $250,000.00.   Defendant also understands that co-defendants U.S. Technology Corporation ("UST") and U.S. Technology Aerospace Engineering Corporation ("USTAE") will enter pleas of guilty in this matter and that each corporation will agree to pay a fine in the amount of $1,500,000.00, and that each corporation will agree to pay restitution jointly and severally to the United States Department of Defense with Defendant in the amount of $850,000.00.   Defendant agrees that he, UST, and USTAE will be jointly and severally liable for total fines and restitution in this matter totaling $4,100,000.00, and consents to the entry of a judgment against them in this matter.

(I)     To assist in the payment of the financial penalties in this matter, defendants WILLIAMS, UST, and USTAE hereby assign thirty percent (30%) of their interest in the

4

Promissory Note existing between UST and U.S. Technology Media, Inc. ("USTM"), executed March 31, 2015. WILLIAMS, UST, and USTAE also assign thirty percent (30%) of the monthly payments due pursuant to this note to the government, and agree that the government shall receive 30% of monthly payments pursuant to the note until such time as the fines and restitution totaling $4,100,000.00 have been paid. WILLIAMS, UST, and USTAE also agree that if USTM is willing, they will not object to the 30% of the monthly payments made pursuant to the note being paid directly to the government or to the Clerk of Court, as may be appropriate. The government does not waive other means available to collect the unpaid balance of fines or restitution.

(J) **Waiver of Appeal Rights and Right of Collateral Attack:** Understanding that Title 18, United States Code, Section 3742 provides for appeal by a Defendant of the sentence under certain circumstances, Defendant waives any right to appeal the imposition of sentence upon Defendant, including the right to appeal the amount of restitution imposed, if any, except in the event that the District Court imposes a sentence that exceeds the advisory guideline range as that range has been calculated by the District Court at the time of sentencing, or in the event that the District Court imposes a sentence in excess of the statutory maximum.

(J) Defendant waives any right to collaterally attack Defendant's conviction and sentence under Title 28, United States Code, Section 2255, or to bring any other collateral attack, except that Defendant shall retain the right to bring a claim of ineffective assistance of counsel. This provision shall not bar the filing of a petition for writ of habeas corpus, as permitted by Title 28, United States Code, Section 2241.

(K) Defendant waives any right to file a motion for modification of sentence, including

5

under Title 18, United States Code, Section 3582(c)(2), except in the event of a future retroactive amendment to the sentencing guidelines which would affect Defendant's sentence.

(L)    Defendant and the Government agree that nothing in this plea agreement shall affect the Government's right or obligation to appeal as set forth in 18 U.S.C. § 3742(b). If, however, the Government appeals Defendant's sentence pursuant to this statute, Defendant is released from Defendant's waiver of Defendant's right to appeal altogether.

(M)    Defendant acknowledges that this waiver may result in the dismissal of any appeal or collateral attack Defendant might file challenging his/her conviction or sentence in this case. If Defendant files a notice of appeal or collateral attack, notwithstanding this agreement, Defendant agrees that this case shall, upon motion of the Government, be remanded to the District Court to determine whether Defendant is in breach of this agreement and, if so, to permit the Government to withdraw from the plea agreement.

(N)    The defendant and the government stipulate and agree that there was no detected or identified biological evidence obtained during the investigation and prosecution of the matter which is subject to DNA testing. The defendant further agrees that all evidence obtained in this investigation and prosecution may be destroyed or returned to its rightful owner.

(O)    Defendant agrees to permit the Government to utilize against Defendant in any subsequent judicial proceeding any and all statements made by Defendant. Defendant understands that Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence ordinarily limit the admissibility of statements made by a Defendant during the course of plea discussions or plea proceedings if the guilty plea is later withdrawn. The Defendant

6

knowingly and voluntarily waives the provisions of limitations of these rules and admits that the statements set forth in the Stipulation of Facts contained in this agreement will be admissible against Defendant for any and all purposes if, for any reason, the Defendant fails to plead guilty, the plea of guilty is voided as a result of the Defendant's conduct, or Defendant filed a motion to withdraw his guilty plea.   If the Court does not accept this plea agreement, the provision of Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence will remain in effect.

(4)

In exchange for the consideration set forth in Paragraph (3) above, the United States Attorney for the Middle District of Georgia agrees as follows:

(A)     That he will accept the plea of guilty by defendant as provided in Paragraph (3)(A), above, in full satisfaction of all possible federal criminal charges, known to the United States Attorney at the time of defendant's guilty plea, which might have been brought solely in this district against the defendant.

(B)     If the defendant affirmatively manifests an acceptance of responsibility as contemplated by the Sentencing Guidelines, the United States Attorney will recommend to the Court that the defendant receive a downward adjustment in the advisory guideline range.   The decision whether the defendant will receive any sentence reduction for acceptance of responsibility rests within the Court's discretion.   The United States expressly reserves its right to furnish to the Court information, if any, showing that the defendant has not accepted responsibility, including, but not limited to, denying his involvement, giving conflicting statements as to his involvement,

or engaging in additional criminal conduct including personal use of a controlled substance.

(C)     That he agrees to recommend that the monetary amount for determining a sentence pursuant to the United States Sentencing Guidelines relating to Count One is $870,000.00.

(D)     That he agrees that fines and restitution ordered by the Court may be payable during terms of supervised release.

(5)

FORFEITURE PROVISION

It is further stipulated and agreed that during the time of the offense stated in Count One of the Indictment, the Defendant obtained a substantial amount of money, that constitutes or was derived from proceeds traceable to the commission of the aforesaid violation of Title 18, United States Code, Section 371, in connection with Title 18, United States Code, Section 201(b)(1).

Defendant hereby agrees to forfeit to the United States voluntarily and immediately all of Defendant's right, title, and interest in twenty thousand dollars ($20,000.00) in United States funds, representing monies paid via check to Reynolds Engineering & Consulting by U.S. Technology Corporation, and voluntarily remitted to the Defense Criminal Investigative Service, which is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), in connection with Title 28, United States Code, Section 2461(c), hereinafter referred to as the "subject property".

(A)     Defendant agrees that the subject property reflects a reasonable compromise between the parties for forfeiture purposes concerning the proceeds the Defendant obtained,

which

court

8

directly or indirectly, as the result of the aforesaid violations of Title 18, United States Code, Section 371.

(B)     Defendant agrees to the entry of a preliminary order of forfeiture of the subject property pursuant to Federal Rule of Criminal Procedure 32.2 upon acceptance of Defendant's plea of guilty by the United States District Court, and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to FED. R. CRIM. P. 11(b)(1)(J), at the time his guilty plea is accepted.

(C)     Defendant agrees that the subject property constitutes or was derived from proceeds traceable to violation(s) of Title 18, United States Code, Section 371, set forth in Count One of the Indictment, and is subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(C), incorporated by Title 28, United States Code, Section 2461(c).

(D)     Defendant agrees fully to assist the United States in the forfeiture of the subject property and to take whatever steps are necessary to pass clear title to the subject property to the United States, including but not limited to, surrender of any documents necessary to transfer Defendant's interest in any of the subject property to the United States, and taking whatever steps are necessary to ensure that the property subject to forfeiture is not sold, disbursed, wasted, hidden, or otherwise made unavailable for forfeiture.

9

(E)     Defendant agrees to waive all interest and not file a claim to any of the subject property, or any other property subject to forfeiture, in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal, which may be or has been initiated.

(F)     Defendant agrees to waive Defendant's right to notice of any forfeiture proceeding involving the subject property, or any other property subject to forfeiture, and agrees not to file a claim or assist others in filing a claim in any such forfeiture proceeding.

(G)     Defendant knowingly and voluntarily waives Defendant's right to a jury trial on the forfeiture of the subject property.   Defendant knowingly and voluntarily waives all constitutional, legal, and equitable defenses to the forfeiture of the funds in any proceeding.   Defendant agrees to waive any jeopardy defense or claim of double jeopardy, whether constitutional or statutory, and agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of the funds by the United States, the State of Georgia, or its subdivisions.

(H)     Defendant agrees that forfeiture of the funds as authorized herein shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the Defendant in addition to forfeiture.

(I)     Defendant agrees to hold harmless, release, and forever discharge the United States, its officers, agents, attorneys, servants, and employees, from any and all actions, causes of actions, suits, proceedings, debts, dues, contracts, judgments, damages, claims, or demands whatsoever in law or equity which the Defendant, his successors, or assigns, ever had, now have, or may have, whether known or unknown, in connection with the seizure and forfeiture of the subject property.

10

(J)   Defendant freely, voluntarily, knowingly, and intelligently waives any right to appeal or collaterally attack any matter in connection with the forfeiture of assets pursuant to this plea agreement.

(K)   Defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.   The forfeitability of any particular property pursuant to this agreement shall be determined as if Defendant had survived, and that determination shall be binding upon Defendant's heirs, successors and assigns until the agreed forfeiture, is collected in full.

(6)

Nothing herein limits the sentencing discretion of the Court.

(7)

This agreement constitutes the entire agreement between the defendant and the United States, and no other promises or inducements have been made, directly or indirectly, by any agent of the United States, including any Assistant United States Attorney, concerning any plea to be entered in this case.   In addition, defendant states that no person has, directly or indirectly, threatened or coerced defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

(8)

As an aid to this Court, the United States Attorney and the defendant, by and through defendant's counsel, enter into the following Stipulation of Fact.   This stipulation is entered into

11

in good faith with all parties understanding that the stipulation is not binding on the Court.   Under

U.S.S.G. Policy Statement Section 6B1.4(d), this Court may accept this stipulation as written or

in its discretion with the aid of the Pre-Sentence Report determine the facts relevant to sentencing.

Subject to the above paragraph, the United States Attorney and the defendant stipulate and

agree that at trial the United States could prove the following beyond a reasonable doubt:

This investigation began as the result of a Department of Defense "hotline" complaint in 2012 by a competitor of the defendant's. The substance of the complaint was that he was being improperly disqualified from NATO Maintenance and Supply Agency (NSPA) PMB contracts. He further alleged an inappropriate relationship between defendant WILLIAMS and Mark Cundiff.  In the early stages of the investigation the ex-wife of defendant WILLIAMS was interviewed.  She confirmed a close relationship between her ex-husband and Cundiff, stating that the WILLIAMS and Cundiff families had taken vacation trips together at defendant WILLIAMS' expense.  She stated that she had been to Cundiff's residence in Macon, GA, and that she had watched the Cundiff children while WILLIAMS and Cundiff conducted business.   She stated that the last trip she attended with WILLIAMS and Cundiff was in January 2010 to Lake Tahoe, CA for a family ski trip.  She provided agents with a photograph taken during the ski vacation showing the WILLIAMS and Cundiff families together at a restaurant.  During the course of the investigation, Mark Cundiff and Christopher Reynolds were approached by law enforcement.     When approached, Reynolds and Cundiff admitted their responsibility and thereafter assisted the investigation.  The following facts were established during the investigation.

Defendant RAYMOND F. WILLIAMS ("WILLIAMS") was the owner and chief executive officer of U.S. Technology Corporation ("UST").  UST is a registered corporation in the State of Ohio, with headquarters in Canton, Ohio. UST is the parent company of U.S. Technology Aerospace Engineering Corporation ("USTAE").   UST provided dry Plastic Media Blasting ("PMB") pellets for stripping paint from aircraft bodies during maintenance and re-painting. USTAE provided metal fabrication services.  UST and USTAE provided products and services to the United States Government at Robins Air Force Base ("RAFB") in Warner Robins, Georgia, through contracts awarded in or about the years 2004 through 2013.  USTAE had a place of business located in Byron, Georgia.

Mark E. Cundiff ("Cundiff") was employed by the Department of Defense, a department of the United States, and was stationed at Robins Air Force Base ("RAFB"), in Warner Robins, Georgia.  Cundiff was responsible for technical

12

engineering support to military aircraft maintenance operations.   It was part of his official duties to prepare statements of work when RAFB was soliciting bidders for new contracts.   Cundiff retired from the United States Department of Defense in January 2014.   WILLIAMS and Cundiff had a professional and personal relationship.   John Christopher Reynolds ("Reynolds") was the owner of Reynolds Engineering, Inc., Macon, Georgia ("REC").

In 2004 or 2005, WILLIAMS requested that Cundiff provide assistance with winning PMB contracts at RAFB.   At that time, RAFB began a new procurement process to establish a supplier for PMB.   The new acquisition process involved the preparation of a Performance Work Statement ("PWS").   The PWS was a document that described the requirements for a bidding company to meet the United States Air Force's ("USAF") needs on a particular job.   Cundiff was the sole person responsible for preparing the PWS.   Cundiff prepared each PWS so that contract requirements could only be met by UST products, which ensured UST would win the PMB contract.   Specifically, Cundiff required using patented UST products "Quickstrip" and "Magic" in the statement of work, requiring a facility within four hours of RAFB, and included a PMB recycling requirement.

In return for assisting WILLIAMS in obtaining the PMB contracts, Williams initially paid Cundiff $0.02 per pound for PMB purchased as a result of the contracts.   The payments were made in cash, totaling approximately $2,000 to $4,000 per year.   In approximately 2005 or 2006, WILLIAMS and Cundiff agreed on payments of $20,000 per year in return for Cundiff's services.   Cundiff's services continued to be preparing the PWSs so that UST would be the only contractor capable of obtaining PMB contracts.   Cundiff received cash payments from WILLIAMS during WILLIAMS' trips to Macon, Georgia.

In about 2008, Cundiff, as part of his official duties at RAFB, approached the North Atlantic Treaty Organization ("NATO") Maintenance Supply Agency ("NSPA") concerning the use of their contracting vehicle to procure a long term $25,000,000 PMB supply contract for RAFB.   The NSPA contract would allow any customer from a NATO country to purchase from the contract.   Cundiff prepared the contract requirements to ensure that UST was awarded the contract.   On or about February 6, 2009, Cundiff sent an email from his Department of Defense email account to NSPA which approved the PMB contract proposal and pricing submitted by UST on behalf of the USAF, and in which Cundiff authorized NSPA to proceed with the contract award to UST.

In about 2009, WILLIAMS paid Cundiff by checks through LT and his company.   WILLIAMS would pay this company, and this company thereafter paid Cundiff $3,000 per month for construction consulting services that were not performed.   This company served as the intermediary for payments from WILLIAMS to Cundiff for approximately twenty months from 2009 to 2011, totaling $55,500.   After this arrangement ceased, cash payments from WILLIAMS

to Cundiff resumed.

In about 2009, Cundiff was assigned as the RAFB Technical Point of Contact "POC" on a C-17 aircraft work stand contract. Work stands are used on the C-5/C-17/C-130 aircraft during maintenance due to the size of the aircraft. The work stands are placed around the exterior of the aircraft and allow workers to access the wings and body of the aircraft while also providing fall protection. As the Technical POC, Cundiff reviewed, approved, and oversaw the contract requirements and the Statement of Work describing the work to be performed. In or about 2011, Cundiff took the C-17 Wing Stand procurement contract to the Army Prototype Integration Fund ("PIF"), located in Huntsville, AL. The PIF is designed to meet the needs of the US Army and Department of Defense by providing a quick response to warfighter needs through a streamlined contract vehicle. The PIF contract vehicle is a maximum of ten year or $1.45 Billion contract with Joint Venture Yulista Management Services Incorporated and Science and Engineering Services Incorporated ("JYVS"). JYVS is the prime contractor on the PIF contract for the rapid execution of PIF approved and directed projects ranging from simple to complex platform design, fabrication, manufacturing, integration, and logistics support. Cundiff was able to influence the process by stressing RAFB's desire to use contractors local to RAFB, as opposed to contractors local to the PIF in Alabama. Cundiff informed the PIF and JYVS that he had knowledge of local contractors who could perform the various types of work and thus he recommended USTAE and JACOBS ENGINEERING ("JACOBS"), as well as, wrote the requirements specific to those contractors. JACOBS was previously involved in the engineering design of the C-17 wing stands. JACOBS owned the original design drawings and was subcontracted to be paid for use of the design as well as any engineering support. USTAE would be used to fabricate and build the C-17 wing stands based on JACOBS' design. On or about September 9, 2011, the PIF awarded the C-17 Wing Stand Contract to YULISTA on behalf of the USAF to build 7 sets of C-17 Aircraft work stands for approximately $19,500,000. YULISTA utilized JACOBS and USTAE as subcontractors for the contract.

Cundiff and WILLIAMS agreed on a plan for Cundiff to be paid for steering the C-17Wing Stand fabrication subcontract to USTAE. The plan involved making payments to Cundiff through Reynolds. USTAE sub-contracted through Reynolds and REC, Macon, GA for design services. While there may have been small items REC needed to perform, there largely would be no work involved in the sub-contract. Cundiff, WILLIAMS, and Reynolds agreed to a plan whereby $40,000 monthly payments would be made to REC over the life of the contract, totaling approximately $700,000. Reynolds would provide fraudulent invoices to employees at UST to provide the purported purpose for the payments to REC. Cundiff received approximately $8,000 per month in cash from Reynolds from

14

August 2011 until November 2013, and was also permitted to live in a house owned by Reynolds located at 105 Colaparchee Plantation Drive, Macon, GA. Cundiff paid no rent to Reynolds for use of the house. Instead, Reynolds deducted the mortgage payment for 105 Colaparchee Plantation Drive out of the monthly $40,000 payments from UST before giving cash payments to Cundiff.   In furtherance of this agreement, Reynolds submitted fictitious invoices to UST for payment on October 14, 2011, June 3, 2013, July 2, 2013, August 1, 2013, and others, after which WILLIAMS issued instructions to his employees by email and otherwise and caused wire transfers in the amount of $20,000 to be sent by UST to Reynolds. Reynolds used the proceeds from these wire transfers to make cash payments to Cundiff and to pay the mortgage on the Colaparchee property.

WILLIAMS also provided funds to be paid by Reynolds to Cundiff through WR and his company. WILLIAMS would provide fraudulent invoices from REC to WR, and would provide the funds for this business to pay Reynolds in relation to the fraudulent invoices. Reynolds would thereafter use this source of funds to make additional payments to Cundiff. One such transaction occurred on August 18, 2011, when WILLIAMS emailed WR a fictitious invoice dated August 17, 2011 from REYNOLDS ENGINEERING CORPORATION ("REC") to WR's company for installation of fast mask kits in the amount of $15,000, and with instructions for WR to prepare and leave a check in this amount for Reynolds at the UST office in Byron, GA. On August 26, 2011, WILLIAMS caused WR to receive a payment by wire transfer from UST in the amount of $50,000, and on August 29, 2011 WR prepared check number 1451 on his business account in the amount of $15,000 to REC. Reynolds thereafter made a cash payment to Cundiff on September 1, 2011, in the amount of $2,400; a cash payment to Cundiff on September 9, 2011, in the amount of $2,300; and a cash payment to Cundiff on September 16, 2011, in the amount of $2,400. After payments from Reynolds stopped, WILLIAMS resumed paying Cundiff approximately $8,000 to $10,000 monthly in cash from November 2013 until January 2014.

On December 17, 2013, Reynolds made a telephone call to WILLIAMS, stating to him that he had panicked following a visit by investigators and that he had shredded a $20,000 check previously provided to him by WILLIAMS. He asked that Williams send him a replacement check. WILLIAMS caused UST check number 1310 dated December 18, 2013 in the amount of $20,000 to be mailed to Reynolds.

During the course of the conspiracy, WILLIAMS caused payments to be made by UST in the total amount of $870,000.00, such payments being used to pay bribes to Cundiff and to reward Reynolds and others for serving as intermediaries to assist WILLIAMS in paying bribes to Cundiff. WILLIAMS received benefits from the efforts of Cundiff in the gross amount of at least $14,450,000.00.

On March 31, 2015, WILLIAMS and UST sold its media division to a buyer

15

for $20,732,429.00. The purchase price was to be paid to UST as a commission on buyer's sales on a monthly basis, with no down payment. The media division of UST provided the PMB pellets pursuant to contracts that had been obtained by UST with the assistance of Cundiff. As part of the sale, UST sold the rights to profits from the existing contracts that had been obtained with the assistance of Cundiff. UST is still owed approximately $15,000,000.00 pursuant to this purchase agreement.

(9)

## ACCEPTANCE OF PLEA AGREEMENT

Defendant understands and has fully discussed with defendant's attorney that this agreement shall become effective only upon the Court's acceptance of this agreement and the Court's acceptance of the plea of guilty by the defendant.

SO AGREED, this 14th day of March, 2018.

CHARLES E. PEELER
UNITED STATES ATTORNEY

BY: _____
PAUL C. McCOMMON III
ASSISTANT UNITED STATES ATTORNEY
GEORGIA BAR NO. 484650

16

I, RAYMOND F. WILLIAMS, have read this agreement and had this agreement read to me by my attorney, Jerome J. Froelich, Jr. I have discussed this agreement with my attorney and I fully understand it and agree to its terms.

RAYMOND F. WILLIAMS
DEFENDANT

I, JEROME J. FROELICH, JR., attorney for defendant RAYMOND F. WILLIAMS, have explained the indictment and the government's evidence received through discovery and my investigation of the charge to defendant.   I believe defendant understands the charge against defendant and the evidence that would be presented against defendant at a trial.   I have read this agreement, have been given a copy of it for my file, and have explained it to defendant.   To the best of my knowledge and belief, defendant understands this agreement.

JEROME J. FROELICH, JR.
ATTORNEY FOR DEFENDANT

17